1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

NADINE JAMISON,

10                              Plaintiff,                        No.  C04-2267Z

11    v.

12    BRAD STORM, individually, CITY OF              ORDER
      MORTON, a Municipal Corporation, ED
13    ENGLISH, individually and as Police Officer
      for the City of Morton, Washington, and
14    GEORGE M. HARBAUGH, individually and
      as Police Officer for the City of Morton,
15    Washington,

16                              Defendants.

17        This matter comes before the Court on a motion for summary judgment, docket no.

18    19, by Officer Ed English and the City of Morton (collectively, "Defendants").  Also before

19    the Court are Defendants' motion to strike the declaration of Brad Storm, docket no 28, and

20    Plaintiff Nadine Jamison's motion to strike Defendants' reply brief as untimely, docket no.

21    31.  Having reviewed Defendants' motion, Plaintiff's brief in opposition, docket no. 23,

22    Defendants' brief in reply, and all supporting declarations and exhibits, and having heard the

23    argument of counsel on March 24, 2006, the Court enters the following Order.

24    **BACKGROUND**

25        This case arises out of a tragic automobile accident that took place at approximately

26    12:30 a.m. on March 24, 2001.  Compl., docket no. 1, ¶ 2.1.  The accident occurred when a

ORDER   -1-

pick-up truck driven by 20-year-old Defendant Brad Storm ("Storm") left the road and rolled down an embankment killing two of Storm's three passengers, 17-year-old Jetaime Hall ("Hall") and 25-year-old Trevor Whitlow ("Whitlow"), and injuring the third, 15-year-old Plaintiff Nadine Jamison.  Id.  Storm was subsequently convicted of vehicular manslaughter and driving under the influence.  Id. at ¶ 2.2.

Sometime between approximately 11:20 and 11:30 p.m. on March 23, 2001, two on-duty City of Morton police officers, Defendant Officer Ed English ("Officer English") and Officer George Harbaugh, came into contact with Storm at a fueling station and mini-mart business known as the Gas Plus.[1]  Id. at ¶ 2.6.  Officer English spoke with Storm for some period of time.  Id. at ¶ 2.7.  During their encounter, Storm asked Officer English for a cigarette, Officer English asked Storm for his identification, which Storm provided, and Officer English gave Storm a cigarette and lit it for him.  Id.  While the preceding facts are undisputed, some of what occurred on the night of March 23, 2001, and the early morning of March 24, 2001, is in dispute.  See Answer, docket no. 4.

Events Preceding the Interaction Between Storm and Officer English

At approximately 8:00 p.m. on March 23, Storm and Whitlow arrived at Hall's grandmother's home in Randle, Washington to pick up Hall and the Plaintiff.  Christie Decl., docket no. 20, Ex. B (Jamison Dep. at 79).  At that point, Storm states that he consumed one beer or less.  Id. at Ex A (Storm Dep. at 94).  After leaving Hall's home, Storm, Whitlow, Hall, and Plaintiff decided to drive to a party at Swofford Pond in Mossyrock, Washington. Id. at Ex. A (Storm Dep. at 37-38); Storm Decl., docket no. 25, ¶ 5.  Storm states that he consumed "maybe half a beer" more between picking up Hall and Plaintiff and arriving at the party.  Id. (Storm Dep. at 94).

---

[1] Officer Harbaugh was dismissed with prejudice as a defendant from this action by stipulation.  Docket no. 18.

1    Storm and his passengers arrived at the Swofford Pond party sometime between 8:00

2    p.m. and 10:00 p.m. Id. (Storm Dep. at 44).  At various points in his deposition, Storm

3    testified he consumed either one beer or two beers at the party.  Id. (Storm Dep. at 44, 94).

4    Storm also testified that some of the beer he and Whitlow had purchased that evening had

5    been stolen out of his truck during the party.  Id. (Storm Dep. at 44, 96).  The four stayed at

6    the party for approximately an hour and a half before leaving for Morton.  Id. (Storm Dep. at

7    44).

8    There is conflicting evidence as to how much alcohol Storm had consumed during the

9    time before his arrival in Morton.  On the low end, Storm states that he had one and a half

10   beers before arriving at the party and one beer at the party, for a total of two and a half beers.

11   However, Storm stated elsewhere in his deposition that he had two beers at the party, for a

12   total of three and a half.  Additionally, Storm signed a declaration prior to his deposition in

13   which he stated that he had "consumed approximately seven beers by that point in the

14   evening."  Storm Decl. at ¶ 16.  When asked during the deposition whether his declaration

15   was accurate, Storm testified:

16           "No.  I gave you the same statement, that I had approximately four to five beers
              at the end of the night, and that's what I can remember now. . .And yeah, like
17           what I'm saying, two to two and a half beers to three beers, somewhere in that
              line is what I had at the point of where you're at right now when I got to the
18           store."

19   Christie Decl. at Ex. A (Storm Dep. at 100).  Later, when asked again, Storm testified that he

20   "consumed five to seven beers *total, in the evening*, yeah."  Sullivan Decl., docket no. 24, Ex

21   B (Storm Dep. at 129) (emphasis added).  When asked how many beers Storm had

22   consumed, Plaintiff testified in her deposition that Storm had consumed eight beers before

23   leaving the party and two beers before arriving in Morton, for a total of 10.  Christie Decl. at

24   Ex. B (Jamison Dep. at 100-01).

25

26

ORDER   -3-

1   Events During the Interaction Between Storm and Officer English

2       Upon arriving in Morton, Storm and his passengers stopped at the Gas Plus Chevron

3   station to get gasoline.  Storm Decl. at ¶ 8.  When they stopped at the Gas Plus, Storm

4   recognized Officer English standing outside the entrance to the store smoking a cigarette

5   with an Officer that Storm had never seen before.  Storm Decl. at ¶ 11.  Having known

6   Officer English from "approximately six or seven" previous encounters, Storm decided that

7   he would go "bum a cigarette from Officer English."  Id. at ¶¶ 14-15.  Storm testified that he

8   knew Officer English from having hunted on his property once when he was 11-12 years old

9   and having talked to Officer English briefly on several occasions about topics such as the

10  weather and fishing in the two years preceding the accident.  Sullivan Decl., Ex B (Storm

11  Dep. at 20-23).  Storm also testified that he and Officer English would call each other by

12  name when they ran into each other.  Id. (Storm Dep. at 24-25).

13      Before speaking to Officer English, Storm "popped a couple of cough drops" in order

14  to "dilute the smell of alcohol on [his] breath."  Storm Decl. at ¶ 15.  Storm testified that he

15  then approached Officer English, who was "looking way" and "talking to the officer when

16  [Storm] pulled up."  Christie Decl., Ex. A (Storm Dep. at 111).  Storm "walked over" and

17  "tapped [Officer English] on the shoulder and asked him for a cigarette, and [they] discussed

18  fishing or something."  Id. (Storm Dep. at 111-12).   Before giving Storm a cigarette, Officer

19  English asked Storm how old he was and for identification, which Strom provided.  Storm

20  Decl. at ¶ 22; English Decl., docket no. 21, ¶ 4.  Both Storm and English state that Storm

21  referred to Officer English by his first name.  Storm Decl. at ¶ 22 ("Ed you know how old I

22  am"); English Decl. at ¶ 4 ("Ed, I am 20 years old, you know that").  According to Officer

23  English: "After [Officer English] gave him the cigarette, [Officer English] spoke with Mr.

24  Storm while [they] both smoked.  When [Storm] finished his cigarette, [Storm] left and

25  [Officer English] turned [his] attention back to [his] conversation with Reserve Officer

26  Harbaugh."  English Decl. at ¶ 5. During this interaction, Storm states that he "was a

conversational distance from Ed English, less than two feet separated us." Storm Decl. at ¶ 23.

Testimony concerning the length of the interaction between Storm and Officer English varies. At the criminal trial, both Storm and Jamison testified that Storm and Officer English spoke for approximately 10 minutes. Sullivan Decl., Ex. E (Storm Testimony at 93), Ex. F (Jamison Testimony at 108). In their depositions, Jamison testified that they spoke for "at least seven minutes," while Storm testified that his best recollection was "one to five minutes." Id., Ex. B (Storm Dep. at 65); Christie Decl., Ex B (Jamison Dep. at 125-26). Yet in his declaration, Storm states that he and Officer English spoke for "about ten minutes." Storm Decl. at ¶ 23. In contrast, Officer English testified that his interaction with Storm lasted "[a]bout 30 seconds, less than a minute." Sullivan Decl., Ex. D (English Testimony at Storm Criminal Trial 132).

The evidence indicating whether or not English had knowledge that Storm was intoxicated during the period when they spoke also varies. Officer English states: "During my entire interaction with Mr. Storm, I never noticed any signs of intoxication. Mr. Storm appeared cogent and sober throughout the entire encounter. I never smelled alcohol or any other intoxicants on his breath or person." English Decl. at ¶ 5. At Storm's criminal trial, Officer English testified:

> Q: Now, when you contacted Mr. Storm in the hospital – you alluded to it, indicating that his level of intoxication wasn't justified with his statement of only having two beers?
>
> A: It was not consistant [sic].
>
> Q: Why do say you that?
>
> A: His level of intoxication was *far greater than it was the first time I had seen him.*

Sullivan Decl., Ex. F. (English Trial Testimony at 141) (emphasis added). In his declaration, Storm states that he "was definitely buzzed when [he] spoke to Police Officer Ed English and

1   the other Police Officer, and looking back, [he is] sure Ed English was aware that [he] had

2   been drinking."  Storm Decl. at ¶ 24.  However, in his deposition, Storm testified that he was

3   "not feeling under the influence of alcohol" when he stopped at the Gas Plus Chevron.

4   Christie Decl., Ex. A (Storm Dep. at 101).  In the criminal trial, Jamison testified that "Brad

5   [Storm] was drunk" when he spoke to Officer English.  Sullivan Decl., Ex. F (Jamison Trial

6   Testimony at 85).

7   While Storm and English spoke, Whitlow filled Storm's vehicle with fuel and entered

8   the Gas Plus to pay for the fuel and purchase another 12-pack of beer.  Sullivan Decl., Ex. B

9   (Storm Dep. at 55-56).  Storm states that Whitlow said "Hi, Ed" when Whitlow passed Storm

10  and English as they spoke but does not recall whether Officer English said anything in

11  response.  Id. (Storm Dep. at 66-67).  In his declaration, Storm states that Whitlow "had a

12  substantial reputation in the community for providing alcohol to minors."  Storm Decl. at ¶

13  21.  Likewise, Officer English states that, if he'd seen Whitlow with Storm that night it

14  would "spark [his] concern."  Sullivan Decl., Ex. A (English Dep. at 100).

15  Both Storm and Plaintiff state that Officer English saw Plaintiff sitting in Storm's

16  pick-up.  Plaintiff states that Officer English looked past Storm into Storm's pick-up while

17  Storm and Officer English spoke and that she made eye contact with Officer English while

18  sitting in the pick-up.  Sullivan Decl., Ex C. (Jamison Dep. at 128-29).  Similarly, Storm

19  states that he is "sure the Police Officers saw the girls inside [his] vehicle, and Mr. Whitlow

20  as he pumped gas and returned to the vehicle."  Storm Decl. at ¶ 27.  Officer English states

21  only that he "never saw Mr. Storm leave the Gas Plus (Chevron) station that evening."

22  English Decl. at ¶ 6.  At one point, Storm stated that there was nothing to suggest that

23  Officer English knew Storm was driving on the evening of the accident.  Christie Decl., Ex.

24  A (Storm Dep. at 112).  However, Storm states that Officer English had seen Storm driving

25  in Storm's pick-up on previous occasions and would have been aware that the pick-up parked

26  50-60 feet away that night was Storm's.  Sullivan Decl., Ex B (Storm Dep. at 132-33).

Officer English's Incident Report written on the morning of the accident states that he "was standing outside having a cup of coffee when Brad Storm and a couple of girls pulled in to get fuel" and that, later, "Brad and the girls left the area."  Sullivan Decl., Ex P (Incident Report at 1).

Events Occurring After the Interaction Between Storm and Officer English

Storm testified that after he and his passengers left the Gas Plus approximately 15 minutes elapsed until the accident.  Id. (Storm Dep. at 83).  Storm also testified that he consumed between one and two beers during that period.  Id. (Storm Dep. at 85).  Approximately five miles from the Gas Plus, Storm's vehicle left the road and rolled several times down a steep embankment.  Compl. at ¶ 2.10.  Hall and Whitlow were thrown from the vehicle and killed, while Plaintiff was trapped inside.  Id. ¶ 2.11.  With help from Storm, Plaintiff was removed from the vehicle and both managed to ascend back to the road.  Id.  Storm then ran for help and an ambulance arrived several hours later.  Id.  Storm's blood-alcohol level was taken at the hospital at 3:47 a.m. and registered at .10 BA.  Sullivan Decl., Ex. O (Criminal Trial Testimony of Melissa Pemberton of the Washington State Toxicology Laboratory at 42-46).  On the morning of the accident, Officer English's Incident Report was completed after he had interviewed Storm in the hospital about the accident.  Sullivan Decl., Ex P (English Report).

Plaintiff's Claims Against Defendants

Based on Storm's interaction with Officer English at the Gas Plus, and her subsequent injuries resulting from the automobile accident occurring on March 24, 2001, Plaintiff brings the following claims against the City of Morton and Officer English: (1) negligence against Officer English; (2) negligence against City of Morton; (3) constitutional rights violation under 42 U.S.C. § 1983 against Officer English; (4) constitutional rights violation under 42

1   U.S.C. § 1983 against the City of Morton.[2]  Compl. at ¶¶ 4.1-7.10.

2   Defendants' Motion to Strike

3       In their Reply brief, Defendants move to strike Storm's declaration as a "sham

4   declaration" under Kennedy v. Allied Mutual Insurance Company, 952 F.2d 262 (9th Cir.

5   1991).  In Kennedy, the Ninth Circuit stated the general rule that "a party cannot create an

6   issue of fact by an affidavit contradicting his prior deposition testimony."  Id. at 266.

7   However, the Kennedy Court also noted that courts have appropriately considered a post-

8   deposition declaration when that declaration is merely an attempt to explain certain aspects

9   of confused deposition testimony and, therefore, is not inconsistent.  Id.  Further, courts

10  cannot apply the Kennedy rule unless they can make "a factual determination that the

11  contradiction was actually a 'sham.'"  Id. at 267.

12      This case is unique in that Storm (a defendant) had his declaration prepared by

13  Plaintiff's counsel *before* his deposition.[3]  Thus, the rules discussed in Kennedy are not

14  immediately applicable because the declaration was clearly not created for the sole purpose

15  of contradicting earlier deposition testimony, which did not yet exist.  Id.  The issue here is

16  which of Storm's statements should be taken as true for purposes of the summary judgment

17  analysis where there are contradictions or inconsistencies between Storm's declaration and

18  subsequent deposition.  For example, Storm stated in his declaration that he "had consumed

19  approximately 7 beers" when he spoke to Officer English, but when cross-examined during

20  his deposition, Storm flatly stated "[n]o . . . I had approximately four to five beers by the end

21  of the night...[and] two to two and a half beers to three beers, somewhere in that line is what

22  I had...when I got to the store."  Storm Decl. at ¶ 16; Christie Decl. at Ex. A (Storm Dep. at

23  100).

24  ──────────────

25      [2] Plaintiff also brings a negligence claim against Storm, but that claim is not at issue in
    this motion for summary judgment.  See Compl. at ¶¶ 3.1-3.6.

26      [3] The Storm Declaration was signed on November 20, 2005.  Docket no. 25.  Storm's
    deposition was taken on December 9, 2005.  Christie Decl., Ex. A.

1    In this case, the Court concludes that <u>Kennedy</u> does not require that the Storm

2  declaration be stricken because, as stated in <u>Kennedy</u>, the Court cannot find that the

3  declaration was actually a "sham."  However, the Court recognizes that portions of the Storm

4  declaration are inadmissable for lack of personal knowledge or as improper opinion

5  testimony.  The Court strikes the following statements from the Storm Declaration: (1) ". . .

6  looking back, I am sure Ed English was aware that I had been drinking"; (2) "Neither Officer

7  did their job that night"; (3) "If the Officers had done their job that night, and made

8  reasonable inquiries and observations that even a person not trained in law enforcement

9  would have made, none of my friends lives would have been taken, Ms. Jamison would not

10  have been seriously injured, and I would not have spent the past three years in prison as a

11  result."  Storm Decl. at ¶¶ 24, 30, 31.  Defendants motion to strike is DENIED with the

12  exception of these statements.

13  <u>Plaintiff's Motion to Strike</u>

14    Plaintiff moves to strike as untimely Defendants' reply brief, which was filed on the

15  noting date (February 10, 2006).  Docket no. 31.  Plaintiff's motion to strike is DENIED.

16  <u>See</u> LR 7(d)(3) (reply papers should be filed no later than the noting date).

17  **D**ISCUSSION

18    Summary judgment is appropriate where there is no genuine issue of material fact and

19  the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The

20  moving party bears the initial burden of demonstrating the absence of a genuine issue of

21  material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party

22  has met this burden, the opposing party must show that there is a genuine issue of fact for

23  trial.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The

24  opposing party must present significant and probative evidence to support its claim or

25  defense.  <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir.

26  1991).  For purposes of this motion, reasonable doubts as to the existence of material facts

1   are resolved against the moving parties and inferences are drawn in the light most favorable

2   to the opposing party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

3   **I.      Plaintiff's 24 U.S.C. § 1983 Claims**

4           Plaintiff brings claims against both Officer English and the City of Morton for

5   constitutional violations pursuant to 24 U.S.C. § 1983.  First, Plaintiff alleges that Officer

6   English's "failure to investigate, stop, and detain Storm violated the rights of Plaintiff as

7   guaranteed by the Fourteenth Amendment."  Compl. at ¶ 6.3.  The Complaint goes on to

8   allege that "[b]y failing to take the required action, [Officer English] affirmatively and

9   willfully placed plaintiff in a position of danger" and that Officer English was "deliberately

10  indifferent [to] and/or callously disregarded the Plaintiff's security, personal safety, and

11  liberty interest."  Id. at ¶ 6.4.  Second, Plaintiff alleges that the policy and practice of the

12  City of Morton authorized Officer English "to disregard proper procedure and enforcement

13  of statutory requirements regarding publicly intoxicated individuals and intoxicated drivers,"

14  which "encouraged and caused constitutional violations."  Id. at ¶ 7.3.  Plaintiff also alleges

15  that "[t]he City of Morton had actual or constructive notice of the pervasive constitutional

16  violations perpetrated by [Officer English]" and that the City's failure to train, direct,

17  supervise, or control Officer English "amounted to deliberate indifference to the rights of

18  persons with whom municipal employees came into contact."  Id. at ¶¶ 7.5-7.6.

19          "To sustain an action under section 1983, a plaintiff must show (1) that the conduct

20  complained of was committed by a person acting under color of state law; and (2) that the

21  conduct deprived the plaintiff a federal constitutional or statutory right."  Wood v. Ostrander,

22  879 F.2d 583, 597 (9th Cir. 1989).  There is no dispute in this case that Officer English was

23  on duty when he spoke to Storm on March 23, 2001, and, therefore, acting under color of

24  state law.  Instead, Defendants move for summary judgment based on their contention that

25  (1) Officer English is entitled to qualified immunity even if there was a violation, and (2)

26  there was no constitutional violation by the City of Morton.

**A.    Qualified Immunity as to Officer English**

The question of whether an officer is entitled to a qualified immunity defense is subject to a two-prong inquiry. Saucier v. Katz, 533 U.S. 194, 201 (2001). "First, a court must determine whether—resolving all disputes of fact and credibility in favor of the party asserting the injury—the facts adduced at summary judgment show that the officer's conduct violated a constitutional right." Kennedy v. City of Ridgefield, __ F.3d __, 2006 WL 539134 (9th Cir. March 7, 2006). If there is no violation, the inquiry is over and courts must grant the officer qualified immunity. However, if an officer does violate a constitutional right, courts must determine whether the violated right was "clearly established" as of the time of the alleged injury. The reviewing court "must consider whether a reasonable officer would recognize that his conduct violates [the] right under the circumstances and in light of the law that existed at the time." Id. at 1144. In this case, Defendants argue that Plaintiff's section 1983 claim fails as to both prongs of the qualified immunity analysis.

**1.    Did Officer English Deprive Plaintiff of a Constitutional Right?**

In DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 196-97 (1989), the Supreme Court held that the due process clause does not guarantee the citizens of a state certain minimal levels of safety and security. In DeShaney, the Winnebago County Department of Social Services became aware that a child was the victim of abuse at the hands of his father after numerous reports. Id. at 192. During several months of observing suspicious injuries to the child, the County's caseworker did nothing to stop the physical abuse. Id. at 192-93. Finally, after the father beat the child so severely as to place the child in a coma and cause brain damage, the child's mother brought a section 1983 action against the County. Id. The Supreme Court held that the Due Process Clause did not require the County to protect the child. Id. at 196-97. The Supreme Court also noted that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to

ORDER   -11-

1  them" and that "the State had no constitutional duty to protect [the child]." <u>Id.</u> at 201.[4]

2  Finally, and perhaps most applicable to this case, the <u>DeShaney</u> Court stated that the "most

3  that can be said of the state functionaries in this case is that they stood by and did nothing

4  when suspicious circumstances dictated a more active role for them." <u>Id.</u> at 203.

5      Plaintiff contends that Officer English violated her Fourteenth Amendment right to

6  substantive due process under the "state-created danger" doctrine, which is an exception to

7  <u>DeShaney</u> that requires Plaintiff to establish two elements: (1) the state officer's affirmative

8  conduct placed Plaintiff in peril; and (2) the state officer acted with deliberate indifference to

9  Plaintiff's safety.  <u>See</u> <u>Wood v. Ostrander</u>, 879 F.2d 583, 588 (9th Cir. 1989) (first

10  recognizing liability based on state-created danger).  Defendants argue that there is no

11  evidence that Officer English undertook affirmative conduct that placed Plaintiff in danger,

12  nor that Officer English was "deliberately indifferent" to Plaintiff's safety.  Thus, to survive

13  summary judgment on this claim, Plaintiff must demonstrate that, given all reasonable

14  inferences in her favor, there are genuine issues of material fact as to both elements of the

15  state-created danger doctrine.

16          **a.    Whether Officer English Placed Plaintiff in Peril**

17      The first issue is whether Plaintiff has raised a triable issue of fact as to whether

18  Officer English's "conduct 'affirmatively placed [Plaintiff] in a position of danger'" under

19  the state-created danger exception.  <u>Wood</u>, 879 F.2d at 589-90 (citations omitted).  In

20  examining this element, courts "do not look solely to the agency of the individual, nor do

21  [they] rest . . . on what options may or may not have been available to the individual."

22  <u>Munger v. City of Glasgow Police Dep't</u>, 227 F.3d 1082, 1086 (9th Cir. 2000).  Since first

23  adopting the state-created danger exception, the Ninth Circuit has had occasion to evaluate

24  _____

25      [4] Since <u>DeShaney</u>, the Ninth Circuit has recognized exceptions to the general rule that the
state is not liable under Section 1983 for harm caused by third-party, non-state actors: (1) where
there is a special relationship between the state and the injured person; (2) where the state
26  creates or enhances the danger to the injured person.  Here, Plaintiff relies only on the second
exception, known as the state-created danger doctrine.

ORDER   -12-

several cases in which plaintiffs alleged that a state actor's affirmative conduct placed them in heightened danger.  These cases are instructive in defining the scope of "affirmative conduct" that may be actionable under section 1983.

In <u>Wood</u>, which first adopted the doctrine in the Ninth Circuit, a police officer arrested the driver of a vehicle, impounded the car, and "apparently stranded Wood, [a passenger in the vehicle], in a high-crime area at 2:30 a.m." <u>Id.</u> at 590.  The Parkland neighborhood, in which Wood was left stranded by the officer, had the highest violent crime rate in Pierce County.  <u>Id.</u> at 586.  Five miles from home, Wood accepted a ride with a stranger who subsequently raped her.  <u>Id.</u>  The <u>Wood</u> Court held that, on these facts, Wood's section 1983 could survive summary judgment.

In two cases following <u>Wood</u>, the Ninth Circuit examined the state-created danger doctrine under the Rule 12(b)(6) "failure to state a claim" standard.  First, in <u>L.W. v. Grubbs</u>, the plaintiff was a nurse employed in a medium security custodial institution for young male offenders.  974 F.2d 119, 120 (9th Cir. 1992).  The plaintiff alleged that the defendants knowingly assigned her to work alone with an inmate who had a history of sexual violence against women and girls without informing her of this history.  <u>Id.</u> at 121.  During an instance when the plaintiff was working alone with the inmate, the inmate assaulted, battered, kidnaped and raped her.  <u>Id.</u> at 120.  On a Rule 12(b)(6) motion, the district court dismissed the plaintiff's section 1983 claim, but the Ninth Circuit reversed and held that, following <u>Wood</u>, the plaintiff had stated a claim under the state-created danger doctrine.  Second, in <u>Penilla v. City of Huntington Park</u>, the police responded to a 911 call for emergency medical services.  115 F.3d 707, 708 (9th Cir. 1997).  The police arrived to find Penilla in "grave need of medical care" but, rather than help, the police cancelled the request for paramedics, broke into Penilla's home and moved him inside, then locked the door behind them as they left.  <u>Id.</u>  "The next day family members found Penilla dead on the floor inside the house." <u>Id.</u>  Once again, the Ninth Circuit held that the alleged actions of the

1  police officers constituted "affirmative conduct" under the state-created danger doctrine and

2  declined to dismiss the claim on a Rule 12(b)(6) motion to dismiss.  Id. at 710.

3      Next, in Munger, the police were called to a bar where Munger was acting belligerent

4  after "consuming substantial amounts of alcohol."  227 F.3d at 1084.  When the police

5  arrived, they ejected Munger from the bar wearing only jeans and a T-shirt into temperatures

6  of minus 20-25 degrees.  Id.  The police also told Munger he could not drive because he was

7  intoxicated.  According to the plaintiffs, Munger was "obviously drunk . . . swaying back and

8  forth, with unsure balance."  Id.  Munger was ultimately found dead of hypothermia in an

9  ally two blocks from the bar.  Id. at 1084-85.  On the defendants' summary judgment motion,

10  the district court concluded that Munger was not affirmatively placed in danger by the

11  officers.  Id. at 1085.  The Ninth Circuit reversed, holding that ejecting Munger from the bar

12  while drunk, thinly clothed, and unable to drive placed him in a more dangerous position

13  than the one they found him in.  Id.

14      Finally, in the recently re-filed Kennedy v. City of Ridgefield, the plaintiff brought a

15  section 1983 claim against a police officer when she and her husband were shot by Michael

16  Burns, a 13-year-old whom she had accused of molesting her daughter. __ F.3d __, 2006 WL

17  539134.  When the plaintiff reported the alleged molestation to the police she specifically

18  requested that the police notify her before informing Burns of the accusation, and the police

19  promised that they would notify her.  Id.  The plaintiff also warned the police officer that

20  Burns had a long history of violent acts.  Id.  Weeks later, the police officer informed Burns'

21  mother of the allegations approximately 15 minutes before notifying the plaintiff that he had

22  done so.  Id.  The police officer then promised to patrol the area around her home and keep

23  an eye on Burns.  Id.  That evening, Burns broke into the plaintiff's home and shot her and

24  her husband while they slept, killing her husband and injuring the plaintiff.  Id.  The

25  Kennedy Court held that the "affirmative conduct" was revealing the existence of the

26  allegations to

1    Burns' mother without notifying the plaintiff as promised and offering false assurances that

2    the police would patrol the neighborhood on the night of the shooting.  Id.

3         The two defining principles that appear to emerge from these Ninth Circuit cases are

4    (1) identifiable conduct by the state actor that rises to more than a mere failure to act, and (2)

5    some contact or connection with the injured parties that creates a causal connection between

6    the state actor's conduct and the increased danger.  See Wood (stranding plaintiff in

7    dangerous neighborhood late at night); Grubbs (assigning plaintiff to work alone with

8    sexually violent inmate); Penilla (moving medically distressed person indoors and calling off

9    the paramedics); Munger (ejecting decedent from bar while he was drunk, thinly clothed, and

10   could not drive himself home); Kennedy (informing violent youth of molestation accusations

11   after promising to notify plaintiff first without doing so and promising to provide police

12   patrol without doing so).

13        In this case, Plaintiff identified Officer English's "affirmative conduct" as failing to

14   arrest or detain Storm after they spoke in front of the Gas Plus.  Plaintiff contends that

15   "Officer English undertook to investigate by asking for Storm's identification and then,

16   knowing Storm was underage and intoxicated, effectively encouraged Storm to continue his

17   illegal conduct."  Pl.'s Opp.,  docket no. 23, at 12.  Additionally, Plaintiff relies on the

18   allegation that Officer English came into contact with Whitlow and that the failure to arrest

19   or detain Storm "emboldened Whitlow" to purchase more alcohol and, thereby, "rendered

20   Nadine Jamison more vulnerable to the danger she was already facing with an intoxicated

21   Storm at the wheel."  Id.

22        In reply, Defendants argue that Officer English's failure to arrest or detain Storm

23   cannot meet the definition of "affirmative conduct" and that the Plaintiff's claim fails

24   because Officer English never came into contact with Plaintiff.  Def.'s Reply, docket no. 28,

25   at 8-10.  First, Defendants argue that Officer English's behavior on the night in question is

26   not analogous to the state actors in the cases discussed above because Officer English took

ORDER   -15-

1   no identifiable actions that placed Plaintiff in greater danger.  Second, Defendants argue that

2   nothing Officer English did was directed at Plaintiff or changed her situation for the worse;

3   that is, before arriving at the Gas Plus Plaintiff was a passenger with an intoxicated driver

4   and after leaving she was in the same position.

5         After briefing was complete but before oral argument, the Court made the parties

6   aware of the Second Circuit's decision in Pena v. Deprisco, 432 F.3d 98 (2d Cir. 2005).  In

7   Pena, various on-duty police officers consumed alcohol and drove with Grey, an off-duty

8   officer, to and from an area bar over the course of several hours.  432 F.3d at 103.  Grey's

9   superiors knew about the drinking and driving, yet allowed it to continue.  Id.  After drinking

10   continuously for nearly twelve hours, Grey drove through a red light striking and killing

11   several pedestrians.  Id.  The Pena Court held that there was a question of fact as to whether

12   Grey's fellow officers and supervisors "told, or otherwise communicated to, Officer Grey

13   that he could drink excessively and drive while intoxicated without fear of punishment."  Id.

14   at 111.  That is, the defendants may have "implicitly *but affirmatively* condoned Grey's

15   behavior and indicated to Grey that he would not be disciplined for his conduct."  Id.

16   (emphasis added).  While the Pena Court concluded that plaintiffs' complaint could satisfy

17   the constitutional violation hurdle of the qualified immunity test, the Court ultimately held

18   that the defendants were entitled to qualified immunity because the right was not "clearly

19   established" as of the time of the incident (August 2001).

20         Plaintiff suggests that Pena is analogous to this case and that the Court should

21   conclude that Officer English violated Plaintiff's constitutional rights by, in effect, implicitly

22   but affirmatively condoning Storm's drinking and driving.  However, Pena does not

23   adequately support Plaintiff's argument for several reasons.  First, factually, the defendants'

24   conduct in Pena is far more egregious than anything that occurred in this case.  Pena

25   involved officers being "encouraged" to drink on police property and at least one of Grey's

26   supervisors asking Grey to drive them both to a bar while Grey was intoxicated.  No similar

conduct is at issue here.  Second, the Ninth Circuit has not adopted the Pena Court's holding that the affirmative conduct element of the state-created danger doctrine may occur "implicitly."  In each of the cases discussed above, the Ninth Circuit has required explicit and identifiable *conduct*, not simply a failure to act.  Finally, the application of Pena is completely foreclosed because the Second Circuit held that the constitutional rule established in Pena was not clearly established as of August 2001.  The accident in this case occurred in March 2001 and, as a result, the Pena rule could not have been clearly established at the time because it had not been established as of nearly five months later.

Accepting the allegations and evidence in the light most favorable to Plaintiff, Officer English was, or should have been, aware that Storm was intoxicated while they spoke for up to 7-10 minutes.  Officer English was also aware that Storm was a minor and that it is illegal for a minor to be intoxicated in public or drive while intoxicated.  He was also aware that Whitlow, who he knew to have provided alcohol to minors in the past, was present because Whitlow said "Hi, Ed" as he entered the Gas Plus.  Finally, he knew that two girls, one of which was Plaintiff, were sitting in a pick-up truck parked 50-60 feet away in the direction from which Storm had approached him.  Plaintiff states that Officer English made eye-contact with her while he spoke to Storm.  While there is no direct testimony that Officer English saw Storm drive into or away from the Gas Plus, Officer English did write that Storm "pulled in to get fuel" that evening and he had seen Storm driving the pick-up on previous occasions.

Even with this favorable interpretation of the facts, Plaintiff has not demonstrated any "affirmative conduct" attributable to Officer English that placed her in greater peril than existed before Officer English spoke to Storm.  Officer English's "conduct" that evening was limited to (1) speaking to Storm, (2) asking Storm for his identification to determine whether Storm was old enough to smoke, and (3) giving Storm a cigarette.  In each of the Ninth Circuit cases discussed above, courts were able to identify a specific act attributable to the

state actor that increased the plaintiffs' peril—no such act exists in this case.  Simply put, an omission or failure to act is not enough to establish the first element of the state-created danger doctrine.  See DeShaney, 489 U.S. at 196-97 (the failure to protect an individual against private violence is not a Due Process Clause violation).  Defendants motion for summary judgment as to Plaintiff's section 1983 claim against Officer English is GRANTED.

### b.      Whether Officer English Acted with Deliberate Indifference

Were the Court to conclude that Plaintiff could establish that there is an issue of fact as to the "affirmative conduct" element of the state-created danger doctrine, the next issue is whether Plaintiff can demonstrate an issue of fact as to "deliberate indifference." "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions."  Kennedy, 411 F.3d at 1143 (citations omitted).  Plaintiff contends that Officer English's indifference is demonstrated by allowing Storm to drive off with his passengers when Officer English had knowledge that he was intoxicated.  Accepting Plaintiff's statement that Officer English saw her and Hall in Storm's vehicle, Officer English was in fact aware of Plaintiff's existence.  It is also reasonable to infer that Officer English recognized that Plaintiff was with Storm that evening because she was in his pick-up truck and that there was some potential for danger to Plaintiff due to Storm's intoxication.  Thus, if Officer English had undertaken affirmative conduct that increased the danger to Plaintiff, a jury could conclude that Officer English was deliberately indifferent.

### 2.      Was the State-Created Danger Doctrine Right Clearly Established?

Even were the Court to conclude that Officer English violated Plaintiff's constitutional rights on March 23, 2001, which is not the case, the Court would still need to determine whether those rights were "clearly established" as of that night.  In Hope v. Pelzer, the Supreme Court succinctly described the "clearly established" test as follows:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent.
>
> . . .
>
> The salient question is whether the state of the law [at the time of the alleged wrong] gave [the officers] fair warning that their alleged treatment of [the injured party] was unconstitutional.

536 U.S. 730, 739 (2002) (citations omitted).

Citing extensively to the principles discussed in Hope, the Kennedy Court first concluded that "it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced" as of 1998.  __ F.3d __, 2006 WL 539134.  In Kennedy, the Court questioned whether the officer was on notice that informing Burns of the molestation allegations without providing notice to the Kennedys and falsely promising police protection would violate the Kennedys' constitutional rights.  Id.  Ultimately, the Kennedy Court concluded that, as in Grubbs, the officer was on notice that it would be a violation to "create an opportunity for Burns to assault Kennedy that would not have otherwise existed."  Id.

The incident in question here occurred in March 2001, meaning the general existence of the state-created danger doctrine was clearly established as described in Kennedy.  Id. at 1144 (state-created danger exception clearly established as of 1998).  The narrower question is whether, assuming Officer English did violate Plaintiff's constitutional rights, it was clearly established that a reasonable officer would conclude that Officer English's "conduct" on the evening of March 23, 2001, was a violation.  The answer is certainly no.  To assume that Officer English violated Plaintiff's rights, this Court would have to conclude that mere inaction in the face of a known or suspected danger is enough to constitute a state-created danger.  No court in the Ninth Circuit has adopted such reasoning and, in fact, DeShaney holds just the opposite.  And as discussed above, Pena is insufficient both because the

ORDER   -19-

1    incident in <u>Pena</u> occurred after the incident in this case and the <u>Pena</u> Court held that the right

2    it articulated was not clearly established as of August 2001.  There is no prior basis to

3    conclude that Officer English was violating Plaintiff's Fourteenth Amendment rights when

4    he spoke to Storm, asked for Storm's ID, and gave Storm a cigarette.  Accordingly, the Court

5    concludes that Officer English is also entitled to qualified immunity as to the state-created

6    danger doctrine claim on the grounds the right Plaintiff asserts, even if it existed, was not

7    clearly established as of March 23, 2001.  Defendants' motion for summary judgment as to

8    the section 1983 claim against Officer English is GRANTED.

9             **B.      Municipal Liability Under 42 U.S.C. § 1983**

10            To hold a municipality liable under section 1983 for the actions of an officer, the

11   plaintiff must (1) demonstrate a constitutional deprivation, and (2) show that the deprivation

12   was visited pursuant to a municipality custom or policy.  <u>See</u> <u>Munger</u>, 227 F.3d at 1087

13   (citations omitted).  Because the Court concludes that there was no constitutional violation

14   under the analysis discussed above, there is no municipal liability under section 1983.

15   Defendants' motion for summary judgment as to the section 1983 claim against the City of

16   Morton is GRANTED.

17   **II.     Plaintiff's Negligence Claims**

18            In addition to her section 1983 claims, Plaintiff brings common law negligence claims

19   against the Defendants.  In the recent <u>Sheikh v. Choe</u>, the Washington State Supreme Court

20   described the basic negligence considerations as follows:

21            The elements of negligence include the existence of a duty to the plaintiff,
             breach of that duty, and injury to the plaintiff proximately caused by the
22            breach.  Whether or not the duty element exists in the negligence context is a
             question of law . . . .
23            . . .
             As a general rule, the common law imposes no duty to prevent a third person
24            from causing physical injury to another.  Additionally, under the public duty
             doctrine, the State is not liable for its negligent conduct even where a duty does
25            exist unless the duty was owed to the injured person and not merely the public
             in general.

26

ORDER   -20-

1    128 P.3d 574, 577 (Wash. 2006) (citations omitted).

2    **A.    Negligence Claim Against Officer English**

3    To avoid the general prohibition against liability under the public duty doctrine,

4    Plaintiff relies on the "failure to enforce" exception.  The failure to enforce exception

5    establishes a duty "where governmental agents responsible for enforcing statutory

6    requirements [1] possess actual knowledge of a statutory violation, [2] fail to take corrective

7    action despite a statutory duty to do so, and [3] the plaintiff is within the class the statute is

8    intended to protect ."  Bailey v. Forks, 108 Wn.2d 262, 268 (1987) (citations omitted).  This

9    exception must be construed narrowly and, to fall within the exception, the statute in

10   question must create a mandatory duty to take specific action to correct a violation.  Smith v.

11   City of Kelso, 112 Wn. App. 277, 282 (2002) (citations omitted).

12   Plaintiff raises negligence claims under the failure to enforce exception on what

13   appears to be two theories.  First, Plaintiff alleges that Officer English owed her a duty to

14   enforce the intoxicated minor statute in RCW 66.44.270.  Second, Plaintiff alleges that

15   Officer English owed her a duty to enforce the driving under the influence ("DUI") statute in

16   RCW 46.61 et seq.  Defendants contend that these claims are foreclosed as a matter of law

17   because (1) Plaintiff is not within the class of people the intoxicated minor statutes are

18   intended to protect, meaning Plaintiff's claim fails as to the third element of the failure to

19   enforce exception; and (2) Plaintiff provides no facts from which a reasonable jury might

20   infer that Officer English could have arrested Storm under the DUI statutes and, therefore,

21   Officer English had no actual knowledge of a violation.  The Court examines each basis for

22   Plaintiff's negligence claim in turn.

23   **1.    Intoxicated Minor Statute**

24   Defendants argue that Plaintiff may not rely on RCW 66.44.270 for her "failure to

25   enforce" negligence claim because RCW 66.44.270 is designed and intended to protect

26   minors who may become intoxicated, not third parties who may be harmed by minors who

1    are intoxicated (i.e., that Plaintiff is not within the class to be protected by the statute).

2    Def.'s Mot., at 16-17.  RCW 66.44.270(2)(a) makes it "unlawful for a person under the age

3    of twenty-one years to be in a public place, or to be in a motor vehicle in a public place,

4    while exhibiting the effects of having consumed liquor."  The statute defines "exhibiting the

5    effects of having consumed liquor" as (1) "a person has the odor of liquor on his or her

6    breath ***and***" (2) is either (i) "in possession of or close proximity to a container that has or

7    recently had liquor in it"; or (ii) "by speech, manner, appearance, behavior, lack of

8    coordination, or otherwise, exhibits that he or she is under the influence of liquor."  Id.

9    (emphasis added).[5]

10        Defendants rely on Hostetler v. Ward, in which the Washington State Court of

11    Appeals reviewed the dismissed claims of a motorcyclist who was injured by an intoxicated

12    minor driving after having consumed alcohol in a county park.  41 Wn. App. 343, 347

13    (1985), rev. denied, 106 Wn.2d 1004 (1986).  After the minor in Hostetler had consumed a

14    large quantity of beer, "a county official 'gave notice to [the minor] and others of the park's

15    impending closure and directed their transportation to the public roadway."  Id.  The minor

16    then proceeded to his vehicle, drove away, and eventually collided with the motorcyclist.  Id.

17    In Hostetler, the Court stated that RCW 66.44.270 "appears to have been designed to protect

18    minors from injuries resulting from their abuse of alcoholic beverages, not to protect third

19    parties injured by intoxicated minors."  Id. at 354.  The Hostetler Court made this statement

20    in its analysis of a negligence per se claim raised by the plaintiff.  Additionally, addressing a

21    "failure to enforce" claim, the Hostetler Court stated that "with regard to the liquor control

22

23        [5] Defendants argue elsewhere that, even if Storm were in violation of RCW 66.44.270,
     he could not have been arrested by Officer English.  This assertion is incorrect as it is based on
24    State v. Hornaday, 105 Wn.2d 120, 130 (1986), which was effectively overruled by statutory
     amendments to both RCW 66.44.270 and RCW 10.31.100 (permitting arrests for misdemeanor
25    violations of RCW 66.44.270).  See State v. Roth, 128 P.3d 114, 118 (Wash. Ct. App. 2006).
     Under these statutes, Officer English could have arrested Storm for being an intoxicated minor,
26    but this does not answer the central question of whether Plaintiff was in the class of persons to
     be protected by RCW 66.44.270 under the failure to enforce exception to the public duty
     doctrine.

laws that allegedly were not enforced [i.e., RCW 66.44.270], plaintiff has cited no authority, and we are aware of none, that provides a clear statement of legislative intent to identify and protect a particular circumscribed class of persons of which Gerald Hostetler is a member." Id. at 362.

In her opposition brief, Plaintiff offers no meaningful response to Hostetler, instead stating as follows:

> However one looks at the statutory framework for driving, alcohol and minors (under the age of 21), including RCW 10.31.100, if Officer English had actual knowledge of Brad Storm's intoxicated state, he violated a duty owed to a class of persons which includes Plaintiff Jamison. This is inarguable. Plaintiff is not merely relying on RCW 66.44.270. She is relying on the entire array of statutory violations committed by Brad Storm and observed by Officer English.

Pl.'s Opp., at 19. Yet at oral argument Plaintiff's counsel suggested that Hostetler is distinguishable because it cited to an overruled Court of Appeals decision in Bailey v. Forks, 38 Wn. App. 656 (1984), overruled by, 108 Wn.2d 262 (1987). Plaintiff is correct only insofar as the Hostetler decision did cite to the Court of Appeals' Bailey decision. See 41 Wn. App. at 361-63 (four citations to Bailey). However, the Hostetler Court did not rely on Bailey for either of the propositions cited by Defendants—namely, that the minor in possession and intoxicated minor statutes are not intended to protect third-parties such as Plaintiff. Hostetler remains good law. Moreover, when asked, Plaintiff's counsel conceded that they could cite no case in Washington State suggesting that the statutes in question are intended to protect third parties. For all of these reasons, the Court concludes that Plaintiff cannot establish that she is within the class of persons intended to be protected by RCW 66.44.270, and that this forecloses a "failure to enforce" exception to the public duty doctrine. Therefore, Plaintiff's negligence claim based on RCW 66.44.270 fails as to the "duty" element as a matter of law.

1          **2.     DUI Statutes**

2          In <u>Bailey</u>, the Washington State Supreme Court addressed the failure to enforce

3    elements in the context of an intoxicated driver who was allegedly allowed by the police to

4    continue driving and subsequently hit a motorcyclist.  108 Wn.2d at 264.  The <u>Bailey</u> Court

5    took review of the issue after a Rule 12(c) motion to dismiss on the pleadings, meaning the

6    Court accepted all of the plaintiff's allegations as true.  <u>Id.</u>  Bailey alleged that a Town of

7    Forks police officer came into contact with Medley, who was intoxicated, and that the officer

8    knew or should have known of Medley's intoxication.  <u>Id.</u>  Bailey further alleged that the

9    officer "personally observed [Medley] enter his truck 'behind the wheel' before later hitting

10   Bailey and another person on their motorcycle."  <u>Id.</u> at 265.  The Court held that Bailey had

11   alleged facts that could satisfy all three elements of the failure to enforce exception if true.

12   <u>Id.</u> at 269.

13         The dispute in this case centers on whether Officer English had actual knowledge of

14   Storm's violation of the DUI statutes.  Assuming Officer English had actual knowledge of a

15   DUI violation, there is no question that Officer English failed to take corrective action nor

16   that Plaintiff was in the class of persons the DUI statutes were intended to protect, as

17   established in <u>Bailey</u>.  Thus, for Plaintiff to demonstrate that Officer English had a duty in

18   the negligence context, she must provide "significant and probative evidence" from which a

19   jury might reasonably conclude that Officer English had actual knowledge that Storm was

20   driving under the influence.  The "actual knowledge" element is generally a question of fact

21   for the jury and, as with other facts, may be established by circumstantial evidence.  <u>Waite v.</u>

22   <u>Whatcom County</u>, 54 Wn.. App. 682, 686-87 (1994).

23         Although Plaintiff does not specify the particular provisions, the DUI statutes in

24   question appear to be RCW 46.61.502 and RCW 46.61.503.  A person is guilty of DUI if a

25   person "*drives a vehicle*" (1) and has an alcohol concentration of .08 or higher within two

26   hours after driving or (2) while the person is under the influence of or affected by

1  intoxicating liquor or any drug.  RCW 46.61.502 (emphasis added).  Additionally, a person

2  is guilty of DUI if the person *"operates or is in physical control of a motor vehicle"* while

3  the person is (1) under the age of twenty-one and (2) has an alcohol concentration of at least

4  .02 within two hours after operating or being in physical control of a motor vehicle.  RCW

5  46.61.503 (emphasis added).

6      Defendants raised the rather salient point that, at a minimum, Plaintiff's actual

7  knowledge evidence must establish that Officer English had probable cause to arrest Storm

8  for a DUI violation.  Without at least having probable cause, Officer English could not have

9  made a lawful arrest and, thus, could not have had "actual knowledge" of a statutory

10  violation.  In Washington State, probable cause exists when the facts and circumstances

11  known to an arresting officer are sufficient to convince a reasonable person that a crime has

12  been committed and that the person to be arrested committed the crime.  State v. Cerrillo,

13  122 Wn. App. 341, 350 (2006).  Establishment of probable cause does not require evidence

14  sufficient to show guilt beyond a reasonable doubt.  Id. at 350-51.  The probable cause

15  determination is not governed by a "mechanical rule" but, rather, courts look to "the total

16  facts of each case, viewed in a practical, nontechnical manner."  State v. Gillenwater, 96 Wn.

17  App. 667, 671 (1999).

18      Defendants contend that Officer English could not have had probable cause to arrest

19  Storm for a DUI violation because the record is devoid of evidence that he witnessed Storm

20  drive or operate a vehicle, which is a prerequisite for DUI violations under both RCW

21  46.61.502 and RCW 46.61.503.  Accepting the allegations and evidence in the light most

22  favorable to the Plaintiff, Officer English was aware that Storm was intoxicated while they

23  spoke for up to 7-10 minutes.[6]  Storm states that Officer English had seen Storm driving in

24

---

25      [6] At Storm's criminal trial, Officer English testified that Storm's "level of intoxication
26  was far greater than it was the first time I had seen him."  Sullivan Decl., Ex F (Officer English
   Testimony at 141).  Giving Plaintiff all reasonable inferences, this statement suggests that Storm
   exhibited some level of intoxication during his first encounter with Officer English.

1    Storm's pick-up on previous occasions and would have been aware that the pick-up parked

2    50-60 feet away that night was Storm's.  Plaintiff also relies primarily on the statement in

3    Officer English's Incident Report that he "was standing outside having a cup of coffee when

4    Brad Storm and a couple of girls pulled in to get fuel" and, later, "Brad and the girls left the

5    area."  Sullivan Decl., Ex P (Incident Report at 1).  The basis for these Incident Report

6    statements is not clear.  On the one hand, Officer English wrote this report following a post-

7    accident interview with Storm, which means Officer English could have been merely

8    repeating a statement made by Storm.  On the other hand, the statement could be based on

9    Officer English's personally having witnessed Storm "pull[] in to get fuel" at the Gas Plus.

10   This is a question of fact, as is Officer English's credibility in explaining how he came to

11   know that Storm "pulled in to get fuel."  If a jury concluded that Officer English witnessed

12   Storm drive into the Gas Plus, and subsequently recognized that Storm was intoxicated,

13   Officer English would have had probable cause to arrest Storm for a DUI violation.

14   Accordingly, Defendants' motion for summary judgment is DENIED as to Plaintiff's

15   negligence claim against Officer English.

16              **3.       Qualified Immunity for Officer English**

17         Defendants raise an additional issue as to whether Officer English is entitled to

18   qualified immunity as to the negligence claim under state law.  In Washington State, a police

19   officer is entitled to qualified immunity from tort liability "if the officer was (1) carrying out

20   a statutory duty, (2) according to procedures dictated to him by statute and superiors, (3)

21   while acting reasonably."  Dang v. Ehredt, 95 Wn. App. 670, 680 (1999).  Defendants argue

22   that "Officer English acted reasonably at all times during the incident in question" because

23   Officer English did not "observe anything in Mr. Storm's behavior that gave him a

24   reasonable and articulable suspicion to detain and/or arrest him."  Def.'s Mot. at 19-20.  In

25   response, Plaintiff contends that the reasonableness of Officer English's actions on March

26   23, 2001, is a question of fact that is in dispute.  Plaintiff is correct.  Accepting her factual

evidence as true, there is a genuine dispute as to whether Officer English should have detained and/or arrested Storm for a DUI violation.  Defendants' motion for summary judgment is DENIED as to their qualified immunity defense for negligence.

### B.   Negligence Claim Against the City of Morton

Plaintiff alleges that the "City of Morton owed a duty to Plaintiff to train and supervise and otherwise control its police officers in the enforcement of statutory requirements and other matters incidental to the exercise of police functions."  Compl. ¶ 52.  Defendants contend that the public duty doctrine establishes that the City of Morton owed no duty to Plaintiff to "supervise or otherwise control" Officer English.  Plaintiff offers no meaningful opposition to this argument, stating only that her "Bailey v. Forks claim has been established for the purposes of defeating defendants' motion for summary judgment."  Pl.'s Opp., at 23.  While Bailey does apply to the claim against Officer English under the failure to enforce exception to the public duty doctrine, Bailey did not implicate a failure to supervise or control claim against a municipality.

Plaintiff does cite a litany of facts in support of her contention that she may bring a section 1983 claim against the City of Morton for failing to train, supervise, or control Officer English.  Pl.'s Opp., at 19-23.  However, in the negligence context, these facts speak only to whether the City of Morton was in *breach of a duty* owed to Plaintiff and does nothing to answer the threshold question of whether such a duty even exists.  The Court concludes that Plaintiff's claim against the City of Morton fails as a matter of law because Plaintiff has not established that she was owed a duty of adequate supervision and control, and no such duty appears to exist under the exceptions to the public duty doctrine.  Defendants' motion for summary judgment as to Plaintiff's negligence claim against the City of Morton is GRANTED.

1    ## CONCLUSION

2         Plaintiff has not raised an issue of fact as to whether her constitutional rights were

3    violated by Officer English under the state-created danger doctrine.  Even if a viable

4    constitutional right existed, Officer English would be entitled to qualified immunity because

5    that right has not been clearly established as it relates to the circumstances of this case.

6    Defendants' motion for summary judgment as to the 42 U.S.C. § 1983 claim against Officer

7    English, docket no. 19, is GRANTED.  Because there is no section 1983 claim against

8    Officer English, Plaintiff's section 1983 claim against the City of Morton also fails.

9    Defendants' motion for summary judgment as to the section 1983 claim against the City of

10   Morton is GRANTED.

11        Under Bailey, Plaintiff has established that there is a disputed issue of material fact as

12   to whether Officer English had "actual knowledge" that Storm was violating the DUI laws in

13   proximity to their encounter on March 23, 2001.  There is also an issue of fact as to whether

14   Officer English's action or inaction that night was "reasonable" under the state qualified

15   immunity test.  Accordingly, Defendants' motion for summary judgment as to the negligence

16   claim against Officer English is DENIED.  Plaintiff has not established that the City of

17   Morton had a duty to supervise or otherwise control Officer English that ran to Plaintiff

18   under the public duty doctrine.  Defendants' motion for summary judgment as to the

19   negligence claim against the City of Morton is GRANTED.

20        Finally, with regard to the motions to strike, the Court DENIES Defendants' motion

21   to strike the Storm Declaration.  Docket no. 28.  However, the Court did not consider

22   inadmissible statements in the Storm declaration for purposes of this motion.  The Court

23   DENIES Plaintiff's motion to strike Defendants' reply brief as untimely.  Docket no. 31.

24

25

26

ORDER   -28-

IT IS SO ORDERED.

DATED this 29th day of March, 2006.


Thomas S. Zilly
United States District Judge